**NATIONAL ENQUIRER, INC., Plaintiff,**

v.

**NEWS GROUP NEWS, LTD.,**
**Defendant.**

**No. 86–8018–Civ.**

United States District Court,
S.D. Florida.

Oct. 5, 1987.

Gerson A. Zweifach, Williams & Connolly, Washington, D.C., Mark B. Kleinfeld, Jones & Foster, West Palm Beach, Fla., for plaintiff.

Neal M. Goldman and Garyowen P. Morrisroe, Squadron, Ellenoff, Plesent, Mandler & Lehrer, New York City, for defendant.

## ORDER DENYING MOTION TO DISMISS

ARONOVITZ, District Judge.

### STATEMENT OF THE CASE

In a six count complaint, the plaintiff, National Enquirer, Inc. ("Enquirer") has brought this action against News Group Newspapers, Ltd. ("News Group"), the defendant, essentially alleging the wrongful appropriation and use of photographic pictures of the wedding of actress Joan Collins and Peter Holm. Specifically, the Enquirer charges News Group with copyright infringement, unfair trade practices and unfair competition, conversion, intentional interference with business relationships, unjust enrichment, and breach of contract.

Collins and Holm were married on November 6, 1985 in a private ceremony in Las Vegas, Nevada. News Group published four black and white photos of the wedding in the November 10, 1985 edition of its British publication, *News of the World.* The Enquirer claims that this publication of the pictures was unauthorized and in contravention to its exclusive rights in the pictures. News Group argues that it had negotiated a valid contract with the Enquirer for the British publication rights of the wedding pictures.

News Group has moved to dismiss under Fed.R.Civ.P. 12(b)(1)–(2) for lack of subject matter jurisdiction over the copyright claim, and lack of personal jurisdiction over News Group. The Court will address the personal jurisdiction issue first.

### STANDARD OF REVIEW

Before beginning to state the facts material to the issue of whether the Court has personal jurisdiction over News Group, it is necessary to establish the appropriate standard for determining disputed facts. Ordinarily, the Court would restrict its inquiry to whether the plaintiff's complaint alleges adequate facts to support personal jurisdiction over a foreign defendant. In this case, the plaintiff's complaint is undeniably meager in alleging a factual basis for jurisdiction over News Group. But the Enquirer chose to supplement its complaint with affi-

davits and deposition evidence, and News Group responded with similar evidentiary support.

News Group suggests that the posture of this case requires the Enquirer to prove the facts establishing in personam jurisdiction by a preponderance of the evidence. It reasons that as both parties have extensively supplemented the pleadings with affidavit and deposition evidence, the Court must resolve factual disputes against plaintiff's obligation to demonstrate jurisdiction by the preponderance of the evidence.

News Group cites *Evans v. Tubbe,* 657 F.2d 661, 663 (5th Cir.1981), as holding that where the parties have mounted a factual attack at the jurisdictional issue, as opposed merely to relying upon the pleadings, "the plaintiffs have the burden of proving that federal jurisdiction does in fact exist." The *Evans* court stated that "when a factual attack is made upon federal jurisdiction, no presumptive truthfulness attaches to the plaintiffs' jurisdictional allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.*

News Group's reliance upon *Evans* is misplaced. The dispute in *Evans* was over subject matter jurisdiction, not personal jurisdiction. Though News Group has moved to dismiss the Enquirer's copyright claims for lack of subject matter jurisdiction, the parties have no dispute as to the facts germane to subject matter jurisdiction. Furthermore, the *Evans* court continued its discussion of this issue by noting that even under a factual attack, the test for dismissal is a rigorous one. In fact, the *Evans* court reversed the district court's dismissal for lack of subject matter jurisdiction.

■ But News Group overlooks a most critical issue in this regard: neither party has requested the Court to hold an evidentiary hearing on these factual disputes. Consequently, the parties, including News Group, apparently are content to rely solely upon already submitted evidence. As the Court has not held an evidentiary hearing on personal jurisdiction, the correct process for establishing jurisdictional facts for purposes of a motion to dismiss is well-established. Initially, the court accepts as true plaintiff's uncontroverted allegations of the complaint and uncontested deposition and affidavit evidence. *Bracewell v. Nicholson Air Services, Inc.,* 748 F.2d 1499, 1504 (11th Cir.1984). If these facts establish a prima facie case of jurisdiction, a motion to dismiss on that basis must, of course, be denied. Because the defendant had not controverted the plaintiff's jurisdictional allegations in *Bracewell,* the court had no cause to evaluate further the correct assignment of burdens.

■ Where a plaintiff's allegations in the complaint are controverted by evidence from a defendant, the plaintiff has the burden to produce evidence substantiating his allegations. But in the absence of an evidentiary hearing, if a plaintiff's uncontroverted and substantiated allegations and evidence support a prima facie case of jurisdiction, then a plaintiff is not required to prove jurisdiction by a preponderance of the evidence. *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977).

This approach to establishing jurisdictional facts has the effect of resolving contested facts in plaintiff's favor. *Brown v. Flowers Industries, Inc.,* 688 F.2d 328, 332 (5th Cir.1982). Without holding an evidentiary hearing, the court must give full credit to plaintiff's jurisdictional factual allegations and evidence, unless the plaintiff has failed to buttress its allegations in the complaint with affidavits or discovery material after the defendant has pierced the pleadings.

## JURISDICTIONAL FACTS

The parties do not dispute the preliminary facts relevant to this litigation. Collins and Holm employed Edward Sanderson, a professional photographer, to photograph their November 6, 1985 wedding in Las Vegas, Nevada. Immediately after the wedding, Sanderson began to negotiate with various publications, including News Group and the Enquirer, in order to sell the publication and syndication rights to the

photographs. Although Sanderson, on behalf of Collins and Holm, had reached a tentative deal with News Group for sale of the pictures, Holm intervened to reject News Group's offer. Instead, Holm accepted the Enquirer's offer in the early afternoon of November 7, 1985. On November 8, 1985 the Enquirer entered into a written contract with Collins, Holm and Sanderson. Under this contract, the Enquirer paid $160,000 for the exclusive right to publish and syndicate the wedding photographs. News Group has not offered an alternate description of the events leading up to the Enquirer's purchase of the wedding pictures.

The Court finds the following facts solely for purposes of this motion to dismiss and based upon the Enquirer's obligation merely to present a prima facie case of jurisdictional facts. On November 7, 1987, News Group's editor, Stuart Kuttner, telephoned the Enquirer's Florida office from London, England to inquire about the Collins wedding photographs. The Enquirer informed Kuttner that it was interested in internationally syndicating the photographs after it formally acquired the rights to them. On November 8, 1987, Kuttner then phoned the Enquirer's London representative, Michael Vohmann, to ask about the wedding pictures. Vohmann told Kuttner that he had no knowledge of the Collins photos, but said that he would get back to Kuttner after speaking with the Enquirer's head office in Florida and expressing Kuttner's interest in the pictures. During this initial conversation, Kuttner told Vohmann that News Group had already telexed the Enquirer in Florida to express its interest in the wedding pictures.

News Group disputes that it telexed Florida before contacting Vohmann in London. Instead, News Group argues that it telexed Florida only after Vohmann informed the defendant that Florida would directly handle negotiations over the Collins photographs. Additionally, News Group says that it contacted Vohmann in London only after being told in its November 7, 1985 phone call to the Enquirer in Florida that London would handle negotiations. The November 8, 1987 telex stated that its pur-

pose was "to urgently confirm interest of News of the World Sunday Magazine in acquiring exclusive British rights to Joan Collins wedding pix...." News Group would thus have London as the preliminary site of negotiations which was only switched to Florida after the Enquirer so directed.

News Groups' expression of interest could hardly have come as a surprise to the Enquirer. The Enquirer was actively seeking to syndicate the rights to publish the Collins photos to newspapers and periodicals around the world. Valerie Virga of the Enquirer was given the job of syndicating the United Kingdom rights to the photos. These rights were of particular interest to the Enquirer as it expected the United Kingdom to be the largest international market, due to the popularity there of Collins' television show, and to her English birth. In fact, the Enquirer told Vohmann to solicit bids for the photos in all of Europe except the U.K., as Virga would handle the U.K. exclusively. Virga saw the News Group telegram of November 8, 1987 before having any contact with the defendant concerning the Collins photographs.

For purposes of this motion to dismiss, the Enquirer has corroborated sufficiently its allegation that substantive negotiations over the Collins pictures never took place in London. When Kuttner of News Group first contacted the Enquirer's Vohmann in London, Vohmann was unfamiliar with the Collins pictures. News Group's telex to Florida stated that Kuttner had already "made contact" with Vohmann, but Vohmann described this contact as merely a message left with his wife while Vohmann was out of the house.

After contacting the Enquirer to learn the status of the Collins pictures, Vohmann called Kuttner back to tell him to deal directly with the Enquirer in Florida. But Kuttner had already telexed the Enquirer's Florida office, according to Vohmann. Vohmann had no further contact with News Group in connection with this matter. As News Group had already contacted Florida twice before Vohmann spoke with Kuttner, and Vohmann had no authority to

negotiate the sale of the Collins wedding pictures, substantive negotiations did not begin in London and subsequently switch to Florida. Instead, Florida was the only place Enquirer representatives negotiated for sale of the pictures.

Though both parties certainly had the same inclination to direct discussions towards Florida, News Group took the lead by calling the Enquirer there on November 7, 1985, and telexing the very next day to express its urgent interest in the Collins photographs. The parties exchanged numerous communications on November 8, 1985, culminating in a simultaneous exchange of telexes on that day which was to be the agreement between the parties over British publication rights to the pictures. The Enquirer claims that the telexes contained materially different terms and that as a consequence no agreement was ever consumated.

The merits of this action—whether the parties actually arrived at an agreement—are not before the court presently. This description of events may become intertwined with the merits at a certain point. Consequently, the Court emphasizes that any factual assumptions for purposes of this motion to dismiss are the result of plaintiff's burden merely to demonstrate a prima facie case of jurisdictional facts. No facts apparently adverse to News Group on the merits are found for any other purpose.

According to the Enquirer, as the parties continued to negotiate, the Enquirer positioned a representative in Los Angeles, California in order to transfer the pictures to a News Group representative should the parties reach an accord. Sometime on November 8, 1987, the Enquirer transferred physical possession of the photographs in Los Angeles to a News Group courier, John Hiscock. Donald McLachlan made the transfer for the Enquirer upon the direction of Virga.

News Group admits that soon after it received the pictures, McLachlan of the Enquirer informed Hiscock that there was no deal and that the pictures should be returned. Hiscock arranged to meet the Enquirer representative at the Los Angeles International Airport to determine whether a deal had finally been reached. After contacting News Group directly, Hiscock was told that negotiations were still ongoing, but that he should deliver the pictures to London by either avoiding the Los Angeles airport, or by using a courier. Hiscock went to the airport with Carl Jason Stephens. Before entering the airport, Hiscock handed the pictures to Stephens, who placed the pictures inside a folded newspaper he was carrying. McLachlan was unable to pursuade Hiscock to return the pictures at their meeting at the airport.

News Group has had contacts with Florida in addition to those directly giving rise to the instant litigation. News Group admits that over the past three years, it has purchased source material from freelance writers in Florida on the average of 55–60 times a year. In addition, News Group said that it purchases photographs from the Enquirer approximately six times a year, or about every two months. News Group also has sent an occasional journalist to Florida. Though News Group now argues that these contacts which it admitted in an affidavit filed with this court are probably exaggerated, for purposes of this motion they are taken as true.

News Group has produced documentation of twelve Florida subscribers. News Group admits to a total of 85 subscribers to its newspaper in the United States. Furthermore, News Group sold a total of 5,021,630 copies of the November 10, 1985 issue of the News of the World. As computed by News Group, these U.S. sales comprise only .0017% of its total sales. News Group does not solicit U.S. subscribers, and it has no Florida offices, employees, telephone numbers, mailing addresses or bank accounts.

## DISCUSSION

◼ Two preliminary matters require the court's determination before turning directly to the merits. The Enquirer suggests that News Group has somehow waived its ability to contest personal jurisdiction. The Enquirer objects to the defendant's failure to move to dismiss until

11 months after the complaint was filed. But News Group alleged in its answer that the Court lacks personal jurisdiction over it, so the Enquirer was placed on notice early on that personal jurisdiction would be a contested issue in this litigation. The Enquirer also argues that News Group has waived its right to contest personal jurisdiction because the defendant included a counterclaim in its answer for breach of contract. But the filing of a counterclaim does not waive a jurisdictional defense asserted in the same pleading. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1330 n. 1 (9th Cir.1984). News Group has not waived its ability to move to dismiss for lack of jurisdiction.

While News Group has not waived its objection to personal jurisdiction, it has taken a position which, in effect, waives some of the protections afforded foreign defendants. News Group has asked the Court to ignore the standards governing personal jurisdiction established by Florida's so-called long-arm statute. Instead, the defendant would have the Court move directly to the issue of whether its contacts with Florida constitute the minimum contacts required by the due process clause. Whatever News Groups' motivation, it has argued that the law requires the Court to "disregard[ ] the Florida long-arm statute...."

The Enquirer, of course, has no objection to this approach, as the Constitution necessarily defines the broadest possible scope of this court's jurisdiction. Consequently, the Court will analyze jurisdiction solely by the standards of the due process clause. *Cf. Rubaii v. Lakewood Pipe of Texas, Inc.*, 695 F.2d 541, 544 (11th Cir.1983) (accepting without deciding plaintiff's characterization of the Florida long-arm statute as reaching the full extent permitted by due process, and rejecting jurisdiction on that basis).

■ A court can exercise general jurisdiction over a corporate defendant only if the defendant has maintained continuous and systematic general business contacts with the forum. Given these substantial contacts, a court can exercise jurisdiction over a foreign defendant even if the cause of action does not arise from or relate to the corporation's activities in the forum. *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir.1986). News Group is certainly not subject to general jurisdiction in Florida. It does not maintain any employees in Florida and does not own any real or personal property in this state. Neither does it have any offices, bank accounts, telephone numbers or mailing addresses in Florida. Apart from purchasing source material from Florida residents, News Group solicits no business in Florida and does not attempt to market its newspapers in Florida.

■ In order for a court to exercise specific jurisdiction over a foreign defendant, the cause of action must arise out of or relate to the defendant's forum contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). "When a claim arises out of or is related to a defendant's contacts with the forum, the court must consider the 'relationship among the defendant, the forum, and the litigation' to determine whether the exercise of jurisdiction was consistent with due process." *Borg-Warner*, 786 F.2d at 1057.

■ Where a defendant has made deliberate and purposeful attempts to establish business contacts in the forum, jurisdiction specific to those contacts is generally appropriate. *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 359 (11th Cir.1987). The defendant's purposeful solicitation is such an important factor because "the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

A defendant's purposeful availment of the privilege of conducting business within the forum helps to insure that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v.*

*Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

▓ A sampling of eleventh circuit precedent helps turn these general propositions into concrete holdings. Perhaps the most important lesson from these decisions is that a single or isolated contact with the forum state, although purposeful in itself, may be insufficient to confer personal jurisdiction. In *Sea Lift, Inc. v. Refinadora Costarricense,* 792 F.2d 989, 994 (11th Cir. 1986), for instance, the court rejected jurisdiction over a defendant based upon a "one-shot operation." Yet that court acknowledged that even "[s]cattershot solicitations of business in the forum state" are likely to establish jurisdiction. *Id.* at 994 n. 6. Likewise, an advertisement in a forum newspaper for employment outside of the forum state is insufficient to support jurisdiction over the nonresident employer on a claim involving the terms of employment. *Johnston v. Frank E. Basil, Inc.,* 802 F.2d 418 (11th Cir.1986).

▓ Where the nonresident defendant has never solicited business in the forum, and its contact with the forum is limited to fulfilling unsolicited orders from a forum resident for goods manufactured by the defendant, jurisdiction is unconstitutional. *Banton Industries, Inc. v. Dimatic Die & Tool Co.,* 801 F.2d 1283 (11th Cir.1986). The failure of the defendant to solicit business in the forum in *Banton* means that it could not reasonably have expected to be haled into a forum state court. In addition, the unsolicited orders it fulfilled makes clear that only the unilateral actions of the forum state plaintiff caused the defendant to have any contact whatsoever with the forum state.

The United States Supreme Court has not explained exactly how a defendant's contacts which relate to the cause of action figure into the personal jurisdiction equation. Neither has the Court provided guidance as to what it means for a contact to relate to the cause of action. But the Supreme Court in *Hall* did make it clear that a court must weigh contacts related to the cause of action as well as those con-

tacts giving rise to the cause of action in assessing specific jurisdiction.

▓ The Enquirer has alleged that News Group infringed its copyright in the Collins pictures. For jurisdictional purposes, "[s]trictly speaking, only those activities which infringe on a copyright owner's exclusive rights as defined in 17 U.S.C. 501 give rise to [a plaintiff's] copyright action." *Educational Testing Service v. Katzman,* 631 F.Supp. 550, 560 (D.N.J.1986). The *Katzman* court also had reason to consider which contacts relate to a copyright infringement claim for purposes of personal jurisdiction. The court said that the only contacts which relate to a copyright claim are those associated with any agreement between the parties concerning the copyrights at issue. *Id.* at 560–61 & n. 12. The court excluded the defendant's general business contacts with the forum state.

If the Enquirer is successful in its argument that this court has subject matter jurisdiction over the copyright claim, then News Group's distribution in Florida of twelve editions of the November 10, 1985 edition of the News of the World clearly gives rise to the copyright claim. Furthermore, the telephone calls and telexes from News Group to the Enquirer's Florida office concerning a possible agreement to publish the Collins photographs relate to the copyright claim. But News Group's routine purchases of Florida photographs and articles from Florida residents does not relate to the copyright claim in any manner whatsoever. As the direct discussions between the parties themselves only relate to the copyright claim, these other Florida purchases by News Group are clearly one step further removed. Their association with any acts of infringement in Florida are simply too attenuated to have any weight in a specific jurisdiction analysis.

The parties in *Katzman* were not diverse, so the court was constrained to examine only those contacts giving rise to or relating to the copyright claim. But the court acknowledged that for diverse parties a court must also weigh contacts giving rise to or relating to state law claims. *Id.* at 560 n. 11. Consequently, the primary

inquiry is which, if any, of the Enquirer's state law claims relate to News Group's weekly purchases of source material from other Florida residents, or to its bi-monthly purchases of photographs from the Enquirer.

The Enquirer's fifth and sixth counts are for unjust enrichment and for breach of contract in connection with the defendant's publication of the Collins photographs. The Enquirer characterizes this lawsuit as arising "out of defendant's regular and frequent purchases of source material from Florida journalists." News Group, on the other hand, describes the negotiations over the Collins photographs as "simply an independent transaction." Neither of these descriptions accurately captures the nature of the defendant's forum contacts.

News Group's attempt to purchase the Collins Photographs directly gives rise to the breach of contract claim and the unjust enrichment claim. News Group's purchases of other Florida source material do not give rise to any of the Enquirer's claims against News Group. But the Enquirer argues that these other purchases from Florida residents are related to News Group's purchase of the Collins pictures to the extent that they evidence News Group's concerted effort to profit from the journalistic work-product of Florida residents. Though they are not formally related by contract, the Court finds that these continuous and substantial Florida purchases are related to the Enquirer's claims for breach of contract and unjust enrichment.

These claims arise from the alleged act of purchase itself, not from any other acts prior to or subsequent to the purchase. Furthermore, these are exactly the same claims that News Group would expect to encounter should any disputes arise over its other purchases in Florida. By contrast, the alleged acts of California conversion, intentional interference with British syndication, and unfair practices would not ordinarily arise in a dispute between News Group and a Florida seller of photographs or articles.

In addition to News Group's admitted continuous purchases from Florida residents, it purchases photographs from the Enquirer in Florida about six times per year. These other purchases clearly relate even more strongly to the Enquirer's contract and unjust enrichment claims concerning the Collins photographs, as the same parties and subject matter are present. News Group's routine of doing business with the Enquirer placed it on notice that it would be subject to jurisdiction in this forum should a dispute arise over these purchases. Though in a broad sense it is News Group's purchases from the Enquirer in particular and Florida in general which give rise to the contract and unjust enrichment claims, the lack of a formal contract connecting these purchases precludes the court from aggregating them all as giving rise to this lawsuit. The defendant's contacts in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), were distinguishable to the extent that they took place under the umbrella of a franchise agreement. But the forum purchases by News Group clearly relate to the alleged contract concerning the Collins photographs, although they do not give rise to the contract claim.

Given News Group's continuous and systematic purchases from Florida's freelance journalists and photographers, its periodic purchases of photographs from the Enquirer itself, and its purposeful solicitation of a contract with the Enquirer to publish the Collins wedding photographs, the Court has little difficulty in concluding that it can constitutionally exercise personal jurisdiction over News Group. Substantive negotiations over the Collins pictures took place between News Group in London and the Enquirer in Florida. News Group indisputably initiated these negotiations by telephoning the Enquirer in Florida on November 7, 1985 to express its desire to purchase rights in the pictures. As the Court has concluded that personal jurisdiction is appropriate based upon these contacts, it is unnecessary to analyze whether any of the Enquirer's other claims also relate to News Group's weekly purchases of Florida source material. News Group has offered no alternate grounds for dismissing these

other claims, such as improper venue or failure to state a claim.

## SUBJECT MATTER JURISDICTION

The defendant also challenges the court's subject matter jurisdiction over the Enquirer's copyright claim. News Group first argues that all 5,021,630 copies of the November 10, 1985 edition of *News of the World* constitute only one alleged infringement. As an apparent alternative theory, News Group submits that the Enquirer's complaint limits its copyright claim to British infringement. In either event, the alleged infringement took place in the United Kingdom, where the United States copyright laws do not extend.

 The defendant is undoubtedly correct that "[i]n general, United States copyright laws do not have extraterritorial effect." *Peter Starr Prod. Co. v. Twin Continental Films*, 783 F.2d 1440, 1442 (9th Cir.1986). Consequently, infringing actions that take place entirely outside of the United States are not actionable in our courts. *Robert Stigwood Group, Ltd. v. O'Reilly*, 530 F.2d 1096, 1101 (2d Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). But News Group does admit to having distributed 85 copies of the November 10, 1985 edition of its newspaper in the United States.

News Group argues that as the 85 editions distributed in the United States constitute only .0017% of its total sales on that date, the rule of *de minimis non curat lex* applies. But in citing the case of *Knickerbocker Toy Co. v. Azrak-Hamway Intern.*, 668 F.2d 699 (2d Cir.1982), News Group has significantly overstated its argument. In *Knickerbocker*, the court held that a single undistributed sample display card could not constitute an infringing copy as it "was only an office copy which was never used." *Id.* at 703. This completely trivial infringement hardly compares to the 85 copies News Group admits to having publicly distributed in the United States.

 As either an off-shoot of its *de minimis* argument, or as an alternative, News Group suggests that all copies of the November 10, 1985 edition constitute just one alleged infringement which took place in the United Kingdom. The defendant fails to cite any decision rejecting subject matter jurisdiction on this theory. Instead, News Group cites *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir.1981), as treating multiple performances as a single infringement. But *MCA* only treated multiple performances as one for the issue of computing statutory damages. In any event, a critical issue in determining whether multiple acts constitute a single infringement is the relationship between them in time and place. In *Robert Stigwood*, for instance, the court held that the different "locales" of performance necessitated treating the performances severally for purposes of computing damages. 530 F.2d at 1103. Likewise, the 85 issues on *News of the World* distributed in the United States are sufficiently distinct from the United Kingdom sales to constitute a separate infringement (or infringements).

The Court has carefully reviewed and considered the extensive memoranda submitted by the parties, including supplemental memoranda filed upon the Court's request, the affidavits and deposition evidence submitted by both parties, and the oral argument heard on this matter, and News Group's motions to dismiss are DENIED. As these motions to dismiss effectively stayed all proceedings in this matter, the parties are directed to file a status report within 15 days from the date of this Order indicating all pending motions.

DONE AND ORDERED in Henderson County, North Carolina this 5th day of October, 1987. A duplicate original of this Order will be executed and filed in Miami, Florida with the Clerk of the Court for the United States District Court, Southern District of Florida, on or before October 15, 1987.